UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| COLUMBUS LTACH MANAGEMENT, LLC and COLUMBUS LTACH, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>QUANTUM LTACH HOLDINGS, LLC and QUANTUM INTERNATIONAL INCOME CORP., GRANT WHITE and MANU SEKHRI,<br><br>Defendants. | Case No. 2:16-cv-06510-JMV-JBC<br><br><br><br>Motion Returnable:  August 7, 2017<br><br>*Document Electronically Filed* |

**BRIEF IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED COMPLAINT ON BEHALF OF DEFENDANTS QUANTUM INTERNATIONAL INCOME CORP. AND MANU SEKHRI**

**DLA PIPER LLP (US)**
Andrew O. Bunn
51 John F. Kennedy Parkway
Suite 120
Short Hills, New Jersey  07078-2704
andrew.bunn@dlapiper.com
Tel.:     (973) 520-2562
Fax:     (973) 520-2582

*Attorneys for Defendants*
*Quantum International Income Corp.,*
*and Manu Sekhri*

Of Counsel:
Andrew O. Bunn

On the Brief:
Steven R. Marino

## **TABLE OF CONTENTS**

**Page(s)**

I.   PRELIMINARY STATEMENT ...................................................................................1

II.  RELEVANT FACTS AND ALLEGATIONS................................................................2

III. ARGUMENT..................................................................................................................4

    A.   Count III Should Be Dismissed Because Plaintiffs Have Not Pled a Plausible Claim for Tortious Interference with Contract Against Quantum Corp. .................4

    B.   Count IV Should Be Dismissed Because Plaintiffs Have Not Pled a Misrepresentations (Fraudulent or Negligent) Against Sekhri or Quantum Corp. (Count IV)................................................................................................................6

        i.   Sekhri Did Not Make Any Misrepresentations .................................................7

        ii.  Quantum Corp. Did Not Make Any Misrepresentations ..................................9

IV.  CONCLUSION..............................................................................................................11

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*ALA, Inc. v. CCAIR, Inc.*,
   29 F.3d 855 (3d Cir. 1994) .................................................................................................... 8

*Electric Mobility Corp. v. Bourns Sensors/Controls, Inc.*,
   87 F. Supp. 2d 394 (D.N.J. 2000) ......................................................................................... 5

*Fountain v. Giove Law Office*,
   Civil Action No. 06-2993 (WHW), 2006 WL 3833471 (D.N.J. Dec. 29, 2006) ................... 5

*Gavornik v. LPL Fin. LLC, LP*,
   Civ. No. 14-955, 2014 WL 3844828 (D.N.J. Aug. 5, 2014) ............................................ 4, 6

*N.Y. Pipeline Mechanical Contractors, LLC v. Sabema Plumbing & Heating Co., Inc.*,
   Civil Action No. 10-148(SRC), 2012 WL 209349 (D.N.J. Jan. 24, 2012) ........................... 6

*Shearin v. E.F. Hutton Grp., Inc.*,
   652 A.2d 578 (Del. Ch. 1994) ............................................................................................... 4

*Union Ink Co., Inc. v. AT&T Corp.*,
   352 N.J. Super. 617 (App. Div. 2002) .................................................................................. 6

## II.     PRELIMINARY STATEMENT

Plaintiffs Columbus LTACH, LLC ("Columbus") and Columbus LTACH Management LLC ("Columbus Management") entered into a Membership Interest Purchase Agreement ("MIPA") with Defendant Quantum LTACH Holdings, LLC ("Quantum Holdings").  In an attempt to recover a "Break Up Fee" under the MIPA, Plaintiffs filed a one-count complaint seeking to compel Quantum Holdings and Defendant Quantum International Income Corp. ("Quantum Corp.") to arbitration pursuant to the dispute-resolution clause in the MIPA.  Plaintiffs never served Quantum Holdings, and Quantum Corp. moved to dismiss because it is not a signatory to the MIPA.  This Court granted Quantum Corp.'s motion, finding that "it is clear from the MIPA that Quantum [Corp.] is not a signatory or party to that contract," and that Plaintiffs "fail to plead any facts" to otherwise compel a non-signatory to arbitration.  (Dkt. No. 7 ("Opinion") at 5, 6).  The dismissal was without prejudice, and Plaintiffs filed their First Amended Complaint ("FAC") on June 15, 2017.  (Dkt. No. 9).

In the FAC, Plaintiffs abandon any effort to compel Quantum Corp. (or any other defendant) to arbitration.  Plaintiffs instead seek to recover the Break Up Fee from all defendants, jointly and severally, through various contract and tort theories.

Despite this change in strategy, Plaintiffs still fail to state plausible claims for relief against (i) Quantum Corp. for tortious interference with Plaintiffs' contractual rights under the MIPA and (ii) Quantum Corp. and its Chief Executive Officer, newly-added Defendant Manu Sekhri, for fraudulent and negligent misrepresentation.  These claims should be dismissed.

## III.     RELEVANT FACTS AND ALLEGATIONS

Columbus "is a facility that is licensed by the New Jersey Department of Health as a 'specialty hospital.'" (Dkt. No. 9-1, MIPA, at 1). Columbus Management "owns all of the issued and outstanding membership interest and financial interest in [Columbus]." (*Id.*).

On June 9, 2015, Columbus Management, Columbus, and Quantum Holdings entered into the MIPA, in which Quantum Holdings agreed to purchase Columbus from Columbus Management for $29 million (the "Purchase Price"). (*Id.* at § 1.2). Quantum Holdings was to deliver the Purchase Price to Columbus Management via wire transfer at the "Closing" (*id.*), which was no occur no later than October 31, 2015, unless extended in writing by the parties to the MIPA (*id.* at § 10.1.7).

The Closing was originally contemplated to take place on "September 15, 2015, and then again, on September 24, 2015." (Dkt. No. 9-2, 9/25/15 Letter). One day after the extended deadline for the Closing had passed, on September 25, 2015, counsel for Plaintiffs wrote to counsel for Quantum Holdings, stating that Columbus Management was giving notice "pursuant to Article X" of the MIPA of its intent to terminate the MIPA (the "September 25 Letter").[1] (*Id.*).

Three days later, on September 28, 2015, counsel for Quantum Holdings responded to the September 25 Letter (i) clarifying that an agreement had been reached to move to the Closing to October 15, 2015 and (ii) stating that "there are no grounds for termination of the MIPA" (the "September 28 Letter"). (Dkt. No. 9-3, the September 28 Letter at 1).

---

[1]     Article X of the MIPA, "Termination," provides the bases by which either Columbus Management (as the Seller) or Quantum Holdings (as the Purchaser) could terminate the MIPA. Because neither Quantum Corp. nor Sekhri is a party to the MIPA, they take no position on whether Quantum Management provided proper notice of termination to Quantum Holding in accordance with the plain language of the MIPA via the September 25 Letter or on any other date or correspondence thereafter.

Counsel for Plaintiffs later confirmed in writing to counsel for Quantum Holdings that Columbus Management "shall abide [by] the terms of the existing purchase agreement [the MIPA]" (the "October 1 Letter"). (Dkt. No. 9-6, October 1 Letter). The October 1 Letter also acknowledged the anticipated Closing of October 15, 2015, as stated in the September 28 Letter, and that the Closing should nonetheless take place before the October 31, 2015 deadline in the MIPA. (*Id.*).

The FAC alleges that Quantum Holdings did not deliver the Purchase Price by the Closing deadline of October 31, 2015. (FAC, ¶ 30). Plaintiffs allege that Quantum Holdings was unable to raise the Purchase Price by October 31, 2015 for two reasons.

First, pursuant to a Subscription Agreement dated July 20, 2015, Quantum Corp. sought to raise CAD $20,000,400 (approximately USD $15.4 million)[2] in an equity offering (the "Offering"). (Dkt. No. 9-3 at 1). The Subscription Agreement outlined how Quantum Corp. intended "to allocate the net proceeds of the Offering," including:

(i) CAD $12,846,224 (approximately USD $9.89 million) for "Funding LTACH Acquisition" and

(ii) CAD $4,196,650 (approximately USD $3.23 million) for "Working Capital and General Corporate Purchases").

(*Id.*, Appendix B at 11). After the Offering was completed, Quantum Corp. allegedly withdrew CAD $4,000,080 (approximately USD $3.09 million)[3] on July 28, 2015 for working capital purposes (the "Working Capital Withdraw"). (*Id.*, Appendix A; *see also* FAC, ¶ 25). Plaintiffs claim that the Working Capital Withdrawal "violated both the terms of the equity raise" and

---

[2]  On July 20, 2015, the conversion rate from CAD to USD was .769942.
[3]  On July 28, 2015, the conversion rate from CAD to USD was .773130.

3

tortuously interfered with the MIPA because it "caused" Napier Park,[4] a hedge fund, "to back out of their commitment to finance the purchase price in the MIPA." (FAC, ¶¶ 18, 23-24).

Second, Plaintiffs also claim that Quantum Corp. and Defendant Grant White, the former CEO of Quantum Holdings and Quantum, obstructed financing from Napier Park "by forcing an unreasonable closing date to include an unrelated hospital in Palm Beach Florida in the transaction." (*Id.*, ¶¶ 10, 17).

As a result of Quantum Holdings' failure to deliver the Purchase Price, Plaintiffs seek to recover from all Defendants, jointly and severally, $580,000.00 in damages plus interest, attorneys' fees and costs, and other damages to be proven at trial. (*Id.*, "WHEREFORE" Clause). The requested quantum of $580,000.00 is derived from Section 10.2.2 of the MIPA:

> In the event of a breach of the Agreement by Purchaser and a termination by Seller is [sic] accordance with the terms of the Agreement at any time on or after June 30, 2015 but before Closing, then Purchaser shall pay to Seller an aggregate fee equal to Two Percent (2%) of the Purchase Price (i.e. the sum of $580,000.00 (the "Break Up Fee").

"Purchaser" is defined in the MIPA as Quantum Holdings. (Dkt. No. 9-1, MIPA, at 1).

## IV. ARGUMENT

### A. Count III Should Be Dismissed Because Plaintiffs Have Not Pled a Plausible Claim for Tortious Interference with Contract Against Quantum Corp.

The FAC alleges that Quantum Holdings is an "alter-ego" of Quantum Corp. (FAC, ¶ 9). As a result, Plaintiffs allege that Quantum Corp. "took steps" to interfere with a contract its corporate affiliate (Quantum Holdings) had entered into with Plaintiffs. (*Id.*, ¶ 17; *see also id.* at ¶ 53). Corporate affiliates are, however, "privileged to confer 'with respect to a contract to which one of them is a party,'" and the non-contracting affiliate "cannot be held liable for

---

[4] The FAC refers to a hedge fund named "Natixis." (FAC, ¶¶ 11-13, 17, 24). The correct name of the hedge fund is Napier Park.

tortuously interfering" unless it "'sought maliciously or in bad faith to injure'" the plaintiff. *Gavornik v. LPL Fin. LLC, LP*, Civ. No. 14-955, 2014 WL 3844828, at *8 (D.N.J. Aug. 5, 2014) (*quoting Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 591 (Del. Ch. 1994)).

Count III should be dismissed because even if this Court reads liberally the allegations in the FAC, it still falls short of alleging that Quantum Corp. acted "maliciously or in bad faith." *Id.*; *see also Fountain v. Giove Law Office*, Civil Action No. 06-2993 (WHW), 2006 WL 3833471, at *3 (D.N.J. Dec. 29, 2006) ("In deciding a motion to dismiss, the Court will allow reasonable inferences in the light most favorable to the non-moving party.  However, those inferences must be **reasonable**.") (emphasis in original).

Plaintiffs' main argument here is that Quantum Corp. knew Quantum Holdings was obligated to deliver the Purchase Price, but that the Working Capital Withdrawal prevented Quantum Holdings from meeting that contractual obligation.  (FAC, ¶¶ 13, 14).  This argument is without merit and highlights some of many inconsistent positions taken by Plaintiffs in the FAC.

First, the FAC alleges on the one hand that the Working Capital Withdrawal was tainted by improprieties and "violated both the terms of the equity raise," but concedes on the other hand that the Subscription Agreement "**allowed**" Quantum Corp. to make the Working Capital Withdraw.  (*Compare* FAC, ¶ 18, *with id.*, ¶ 25) (emphasis added).  The latter is a judicial admission.  *See Electric Mobility Corp. v. Bourns Sensors/Controls, Inc.*, 87 F. Supp. 2d 394, 405 (D.N.J. 2000).  It therefore cannot follow that the Working Capital Withdrawal was malicious or taken in bad faith because Quantum Corp. acted in accordance with the explicit disclosures made in the Subscription Agreement, as acknowledged by Plaintiffs.

Second, the Working Capital Withdraw did not deplete the funds raised by the Offering. The net balance of funds raised by the Offering after the Working Capital Withdraw was CAD $15,026,439.06 (approximately USD $11.62 million) as of September 21, 2015.[5] (Dkt. No. 9-3, Appendix B). The main purpose of the Offering was to "fund a **portion** of the [P]urchase [P]rice," and millions of dollars were available even after the Working Capital Withdraw to fulfil that purpose. (Dkt. No. 9-3, Appendix A at 3) (emphasis added). It therefore defies logic for Plaintiffs to argue that the Working Capital Withdraw was intended to interfere with the MIPA when Quantum Corp. contemporaneously set aside millions of dollars towards the Purchase Price consideration.

All that is left in the FAC are unsupported conclusory allegations about Quantum Corp.'s actions. (*See, e.g.*, FAC, ¶ 53). Those allegations are insufficient as a matter of law. *See Gavornik*, 2014 WL 3844828, at *8 (failure to state a claim for tortious interference because "Plaintiff's conclusory statement does not include any factual allegations suggesting that [the non-contracting affiliate] sought, in bad faith, to injure Plaintiff").

### B. Count IV Should Be Dismissed Because Plaintiffs Have Not Pled a Misrepresentation (Fraudulent or Negligent) Against Sekhri or Quantum Corp. (Count IV).

It is axiomatic that a misrepresentation is the underpinning of a claim for fraudulent or negligent misrepresentation. *See N.Y. Pipeline Mechanical Contractors, LLC v. Sabema Plumbing & Heating Co., Inc.*, Civil Action No. 10-148(SRC), 2012 WL 209349, at *4 (D.N.J. Jan. 24, 2012) ("The elements of negligent misrepresentation are essentially the same as those of common law fraud except negligent misrepresentation does not require scienter."); *Union Ink Co., Inc. v. AT&T Corp.*, 352 N.J. Super. 617, 645 (App. Div. 2002) ("Incorrect statement and

---

[5] On September 21, 2015, the conversion rate from CAD to USD was .754575.

misstatement of fact are elements of both common law fraud and negligent misrepresentation."). Count IV should be dismissed because the FAC does not allege that Sekhri or Quantum Corp. made any misrepresentations to Plaintiffs.

### i. Sekhri Did Not Make Any Misrepresentations.

The FAC alleges that White was the individual from the purchaser side with the primary responsibility for the transaction. (FAC, ¶ 10). The FAC further alleges that White was fired on October 28, 2015—three days prior to the final closing date of October 31, 2015—and that Sekhri replaced White. (*Id.*, ¶¶ 11, 29 30). It is therefore unsurprising that the FAC contains only a handful of references to Sekhri:

- Paragraph 13: "The loan broker who shopped the deal could only get [Napier Park] on board in that timeframe and when they were committed, [Napier Park] imposed last minute additional requirements because Quantum, **Sekhri**, and White expended money they raised from the Canadian public markets on working capital and [Napier Park] would not increase the loan amount."

- Paragraph 23: "[O]ver $4 million CAD were [sic] withdrawn by Quantum, White and **Sekhri** from the gross proceeds which were to be available to conduct the transaction."

- Paragraph 28: "October 28, 2015, came and went and counsel to defendants contacted counsel to plaintiffs and advised that the transaction would not come to fruition and that **Sekhri** would come to LTACH the following day to present alternative options."

- Paragraph 29: "On October 29, 2015, **Sekhri** came and had no acceptable alternative options to conclude the transaction and made several **admissions** concerning White and Quantum's activities which interfered with Quantum LTACH's ability to close the transaction. Sekhri informed plaintiffs that he had been appointed CEO of the company."

- Paragraph 59: "Defendants White and **Sekhri** were well aware of Defendant Quantum's financial condition when it made promises that they were aware neither Quantum nor Quantum LTACH could fulfill to secure their own positions and induce Plaintiffs into entering the MIPA."

(Emphases added). There are no other references made to him in the FAC.

7

Paragraphs 13 and 23 do not refer to any statements made by Sekhri to Plaintiffs, but instead his purported role in the Working Capital Withdraw. Exhibit D to the FAC confirms that Sekhri did **not** have a role in the Working Capital Withdraw. Exhibit D is a letter from Plaintiffs' counsel to counsel for Quantum Holdings, dated September 30, 2015, in which Plaintiff's counsel (i) noted that Subscription Agreement allowed "Grant"—i.e. Defendant Grant White—to make the Working Capital Withdraw and (ii) inquired what "he" did with the funds. (Dkt. No. 9-4). No reference is made to action(s) taken by Sekhri. *See ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control.").

Paragraph 59 fails for the same reason as Paragraphs 13-23—it does not allege that Sekhri made any statements to Plaintiffs. Paragraph 59 only contains allegations about Sekhri's (and White's) knowledge of "promises" made by Quantum Corp. to Plaintiffs. This Paragraph does not, however, refer to any "promises" made by Sekhri, as the reference to "when **it** made promises" cannot refer to an individual, but only Quantum Corp., the only other noun proceeding the pronoun. (*Id.,* ¶ 59) (emphasis added). That Sekhri did not make any representations to "induce Plaintiffs into entering the MIPA" makes sense from a temporal perspective given that, as stated above, the FAC alleges that White—not Sekhri—was responsible for the MIPA negotiations, and that Sekhri did not replace White until approximately October 28, 2015. (*Id.*, ¶¶ 10, 11, 29 30).

Paragraph 29, as setup by Paragraph 28, is the only place in the FAC that alleges an exchange between Sekhri and Plaintiffs. This exchange allegedly occurred in connection with efforts by Sekhri after White was fired on October 28, 2015 and prior to the Closing scheduled

8

for October 31, 2015. However, there are no allegations that any of those statements were <u>mis</u>statements. Plaintiffs instead suggest that Sekhri was honest in his dealings with them because they cast his statements positively in their favor as "admissions."[6] (FAC, ¶ 29).

Accordingly, because the FAC fails to allege any misrepresentations, this Court need not go further and address the remaining elements of each claim.

### ii. Quantum Corp. Did Not Make Any Misrepresentations.

The allegations in the FAC leading up to Count I (Paragraphs 1-41) do not disclose any statements made to Plaintiffs by Quantum Corp.—whether through Sekhri, White or otherwise. Instead, those Paragraphs refer to alleged *conduct* by Quantum Corp. and statements it allegedly made *to others* that Plaintiffs claim negatively impacted the ability to raise the Purchase Price. For example:

- <u>Paragraph 14</u>: "As a result of Quantum [Corp.'s] actions, Quantum [Holdings] was unable to secure the financing necessary to conclude the transaction with plaintiffs."

- <u>Paragraph 15</u>: "Quantum's larger investors were asked to reinvest money and told that they had a new term sheet from a lender that White had worked with in the past."

- <u>Paragraph 16</u>: "The transaction was scheduled to close on September 24th 2015, yet even as it was supposed to close, White was flying around the world on airplanes looking for even more deals with no intention of closing."

- <u>Paragraph 17</u>: "Quantum [Corp.] and White actively took steps to interfere with Quantum [Holdings'] contract with plaintiff causing Quantum [Holdings] to breach its obligations to deliver the purchase price by falsely promising to be able to deliver the cash portion when negotiation with [Napier Park] and by forcing an unreasonable closing date to include an unrelated hospital in Palm Beach Florida in the transaction."

- <u>Paragraph 24</u>: "Upon information and belief, this withdrawal [the Working Capital Withdraw] caused [Napier Park] to back out of their commitment to finance the purchase price in the MIPA."

---

[6] For the avoidance of doubt, Sekhri does not concede that he made the "admissions" as alleged in Paragraph 29 of the FAC, except for the purposes of this motion, which assumes all facts alleged in the FAC to be true.

9

Paragraphs 14, 15, 16, and 24 do not allege any statements made by Quantum Corp. or its agents. To the extent Plaintiffs have objections to the conduct alleged in these paragraphs, that conduct is in the subject of Count III (tortious interference). Although Paragraph 17 does refer to a statement allegedly made by Quantum Corp., that statement is alleged to have been made in the context of "negotiations with [Napier Park]"—not with Plaintiffs.

All that is left is Paragraph 59 which is pled as part of Count IV. As stated above, Paragraph 59 refers to a "promises" Quantum Corp. allegedly made about its financial condition in order to "induce Plaintiffs into entering the MIPA." While a reading of the FAC in its entirety concentrates on Plaintiffs' complaints about Defendants' alleged conduct <u>after</u> the MIPA was entered into, this is the first—and only—reference to alleged conduct <u>prior</u> to entering into the MIPA.

This standalone Paragraph lacks any supporting factual allegations. For example, there is no detail as to what Quantum Corp. promised Plaintiffs about its financial condition or wherewithal, and therefore no basis by which to assess whether the promises were or were not inaccurate or misleading. To illustrate, even if Paragraph 59 could be construed indulgently to mean that Quantum Corp. overstated its financial position to Plaintiffs, those statements had to have occurred on or before June 9, 2015, the date of the MIPA. However, at that time, the Offering (dated July 20, 2015) had not even taken place. Because the Offering had not taken place, there was no Working Capital Withdraw, thereby no basis for Napier Park to change the terms of loan. Indeed, the FAC alleges that Napier Park imposed "last minute additional requirements" on the loan *in response to* the Working Capital Withdraw. In sum, without any supporting factual detail, Plaintiffs are unable to explain how the alleged statement underlying Paragraph 59 could have been a false statement on the date it was made.

## V. CONCLUSION

For the foregoing reasons, the First Amended Complaint should be dismissed as to Defendants Quantum International Income Corp. and Manu Sekhri.

Respectfully,

Dated: July 7, 2017

*s/ Andrew O. Bunn*
Andrew O. Bunn
51 John F. Kennedy Parkway, Suite 120
Short Hills, New Jersey  07078-2704
andrew.bunn@dlapiper.com
Tel.:    (973) 520-2562
Fax:    (973) 520-2582

*Attorneys for Defendants*
*Quantum International Income Corp.,*
*and Manu Sekhri*