**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| COLUMBUS LTACH MANAGEMENT, LLC & COLUMBUS LTACH, LLC, <br><br>*Plaintiffs*, <br><br>v. <br><br>QUANTUM LTACH HOLDINGS, LLC, *et al*, <br><br>*Defendants*. | Civil Action No. 16-6510 <br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This matter comes before the Court on the motion of Defendants Quantum International Income Corp. ("Quantum Income") and Manu Sekhri's (collectively "Defendants") to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). D.E. 13. Plaintiffs Columbus LTACH Management, LLC ("Columbus Management") and Columbus LTACH, LLC ("Columbus") (collectively "Plaintiffs") filed a brief in opposition, D.E. 17, to which Defendants replied. D.E. 18.[1] Defendants Quantum LTACH Holdings, LLC ("Quantum Holdings") and Grant White ("White") did not participate in the motion. The Court reviewed the submissions in support and in opposition and considered the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Defendants' motion is **GRANTED**.

---

[1] In this Opinion, Defendants' motion to dismiss (D.E. 13) will be referred to as "Def. Brf." Plaintiff's brief in opposition (D.E. 17) will be referred to as "Pl. Opp." Defendants' reply brief (D.E. 18) will be referred to as "Def. Rep."

I.  **FACTUAL AND PROCEDURAL HISTORY**

   **A. Factual History**

Plaintiff Columbus Management is a New Jersey limited liability company with its main address in Newark, New Jersey. Amended Complaint ("FAC") at 1; D.E. 9. Plaintiff Columbus is a long-term acute care hospital in New Jersey that shares the same address as Columbus Management. *Id.* Defendant Quantum Holdings is a limited liability company with its main address at Wellington Street West, Ontario, Canada. *Id.* ¶ 1. Defendant Quantum Income is a corporation that shares the same address as Quantum Holdings. *Id.* ¶ 2. At all relevant times until October 28, 2015, Defendant White was the CEO of both Quantum Holdings and Quantum Income. *Id.* ¶ 10. Defendant Sekhri later replaced White as the CEO of both. *Id.* ¶ 29.

On June 9, 2015, Columbus, Columbus Management, and Quantum Holdings executed a Membership Interest Purchase Agreement ("MIPA"), through which Columbus Management agreed to sell Columbus to Quantum Holdings for twenty-nine million dollars ("the deal"). FAC, Ex. A., MIPA; D.E. 9-1. Non-party Richard Lipsky, M.D., the managing member of both Columbus Management and Columbus, is also a party to and signatory of the MIPA. MIPA at 1, 49. The MIPA included a "Break Up Fee" provision, which provided as follows:

> In the event of a breach of the Agreement by Purchaser and a termination by Seller in accordance with the terms of the Agreement at any time on or after June 30, 2015 but before Closing, then Purchaser shall pay to Seller an aggregate fee equal to Two Percent (2%) of the Purchase Price (i.e. the sum of $580,000.00) (the "Break Up Fee"). Payment of the Break Up Fee shall be made within 5 Business Days of the termination. Any portion of the Break Up Fee not paid when due shall accrue interest at the rate equal to the lesser of (i) ten percent (10%) per annum and (ii) the highest rate allowed under applicable law. The Parties acknowledge and agree that the amount of the Break Up Fee is not intended as a penalty and does not have the legal effect of a penalty but instead is intended as

> liquidated damages in satisfaction of Purchaser's obligations under the Agreement.

*Id.* § 10.2.2. The MIPA also provided for a closing date no later than October 31, 2015 (the "drop dead date"), unless the parties agreed in writing to extend that date. *Id.* § 10.1.7.

Quantum Income is not a signatory or party to the MIPA. In the FAC, Plaintiffs allege that "Quantum [Holdings] is nothing more than an alter-ego of Quantum [Income]." *Id.* ¶ 9. In support of this theory, Plaintiffs point out that on June 12, 2015, Quantum Income put out a press release announcing its acquisition of Columbus. FAC, Ex. G; D.E. 9-7.

Following the signing of the MIPA, Anthony Modafferi, counsel for Columbus, Columbus Management, and Dr. Lipsky and Gary Herschman, counsel for Quantum Holdings and White, exchanged several communications concerning the deal's closing. On September 25, 2015, Mr. Modafferi sent Mr. Herschman a letter stating that since the two anticipated days of closing, September 15th and 24th, had passed and since Quantum Holdings had just informed Columbus, Columbus Management, and Dr. Lipsky that it lacked the money to purchase Columbus, Columbus, Columbus Management, and Dr. Lipsky were terminating the MIPA. FAC, Ex. B; D.E. 9-2. On September 28, 2015, Mr. Herschman replied, stating that Columbus, Columbus Management, Dr. Lipsky, Quantum Holdings, and White had agreed to move the closing to October 15, 2015, or sometime thereafter but before November 1, 2015. FAC, Ex. C; D.E. 9-3. Mr. Herschman also attached a letter, showing that Equity Financial Trust Company was holding CAD $15,026,439.06 in escrow for Quantum Income. *Id.* The letter also included an appendix which provided that Quantum Income had deposited CAD $19,026,387 in escrow on July 28, 2015, but had removed CAD $4,000,080 later that same day. *Id.*, Appendix A.

On September 30, 2015, Mr. Modafferi again wrote to Mr. Herschman, indicating that

since White had asked for additional information from Columbus, Columbus Management, and Dr. Lipsky, an additional CAD $50,000 needed to be added to the closing price or Break Up Fee to revive the MIPA. The letter also asked what White had done with the four million that he withdrew from escrow as working capital. FAC, Ex. D; D.E. 9-4. In an email, Mr. Herschman responded that the MIPA remained in force and did not need reviving. Counsel also agreed that Quantum Holdings would pay the incremental costs as to gathering the additional information. Further, Mr. Herschman added that if Dr. Lipsky "would like to know what Quantum has done with the funds released thus far, he should call Grant White, who would be happy to discuss this with him." FAC, Ex. E; D.E. 9-5.

On October 1, 2015, Mr. Modafferi wrote Mr. Herschman a letter reaffirming his belief that the deal would close. The letter explained that "[t]his will confirm that based upon our prior conversation with Canadian counsel for the purchase . . . that your client is working to close the [Columbus] Acquisition by October 15, 2015, and in any event, before the October 31, 2015 drop-dead date specified in the Agreement." FAC, Ex., D.E. 9-6. However, on October 28, 2015, Mr. Herschman wrote that the deal would not close. FAC ¶ 28. Mr. Herschman said that Sekhri would meet with Columbus Management, Columbus, and Dr. Lipsky the next day and provide alternative terms for the MIPA. *Id.* That same day, October 28, 2015, the board of Quantum Income and Quantum Holdings fired White for improperly seeking to borrow money from a hedge fund. FAC ¶ 11. White had allegedly sought to borrow money from Natixis,[2] a hedge fund, to purchase a hospital in Palm Beach, Florida. *Id.* ¶¶ 11-13.

---

[2] Defendants allege that correct name of the hedge fund is Napier Park. Def. Brf. at 4 n.4. Plaintiffs continue to refer to the hedge fund as Natixis. Pl. Opp. at 6. In this Opinion, the Court uses Natixis as it is the name provided in the Amended Complaint.

The meeting took place the following day, but Columbus Management, Columbus, and Dr. Lipsky deemed Sekhri's alternatives insufficient. *Id.* ¶ 29. Columbus Management and Columbus allege that during this meeting, Sekhri made several admissions, which show that White and Quantum Income interfered with Quantum Holdings' ability to close the deal. *Id.* In particular, Columbus and Columbus Management allege that the withdrawal of the four million from the escrow account caused the lenders to "back out of their commitment to finance the purchase price in the MIPA." FAC ¶ 23. Sekhri also informed Columbus Management, Columbus, and Dr. Lipsky that he had been appointed CEO of Quantum Holdings and Quantum Income. *Id.* ¶ 29.

Three days later, October 31, 2015, the MIPA's drop dead date passed without a closing. *Id.* ¶ 30.

### B. Procedural History

On March 21, 2016, after it "became clear" that Defendants would not deliver the purchase price, Plaintiffs filed a demand for arbitration. *Id.* ¶ 31. Defendants did not respond to Plaintiffs' demand. *Id.* ¶¶ 34-35. As a result, Plaintiffs filed a Complaint in New Jersey state court on August 31, 2016, seeking to compel Defendants to arbitrate. *Id.* ¶ 36. The Complaint did not ask for any form of relief other than to compel arbitration.

On October 5, 2016, Quantum Income removed the matter to the District of New Jersey, D.E. 1, and then filed a motion to dismiss on November 3, 2016, D.E. 3. *Id.* ¶¶ 39-40. The Court granted Defendant's motion and dismissed the Complaint without prejudice. D.E. 7-8.

Plaintiffs filed an Amended Complaint on June 15, 2017. D.E. 9. In the Amended Complaint, Plaintiffs completely forgo the original remedy they sought to compel arbitration. Instead, the Amended Complaint alleges four counts: breach of contract (Count I); breach of

implied covenant of good faith and fair dealing (Count II); tortious interference with contractual relations (Count III); fraudulent and negligent misrepresentation (Count IV).[3] Defendants then filed the current motion seeking as a dismissal of Count III as to Quantum Income and requesting a dismissal of Count IV as to both Quantum Income and Sekhri.

## II.     LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted[.]" To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions

---

[3] The parties dispute whether Defendants Quantum Income and Sekhri are subject to Counts One and Two. Pl. Opp. at 3; Def. Rep. at 2. As neither Quantum Income or Sekhri have sought relief on this issue, the Court does not address it in this Opinion.

disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols.*, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

### III. LAW AND ANALAYSIS

At the outset, the Court notes that the Amended Complaint is somewhat unclear. Among other things, the Amended Complaint assumes a level of familiarity with the underlying facts and circumstances that is inappropriate in a pleading. It *appears* that Plaintiffs main argument is that when Quantum Holdings or Quantum Income raised money[4] to fund the purchase of the hospital, Columbus, White improperly used a portion of that money thereby leaving insufficient funds to close on the deal.

#### A. Count III (Tortious Interference with Contractual Relations)

Quantum Income seeks a dismissal of Count III, which alleges that tortious interference with contractual relations. The MIPA provides that any claim arising out of or as a result of the contract will be governed by New Jersey law. MIPA § 10.1.7. Thus, Plaintiffs claim for tortious interference is governed by New Jersey law.

Under New Jersey law, a plaintiff seeking to establish a claim of tortious interference with contractual relations "must prove (1) an existing contractual relationship; (2) intentional and malicious interference with that relationship; (3) loss or breach of a contract as a result of the interference; and (4) damages resulting from that interference." *MaxLite, Inc. v. ATG Elecs., Inc.*,

---

[4] Plaintiffs refer to the raising of funds as an equity raise, while Defendants call it a subscription agreement.

7

193 F. Supp. 3d 371, 388 n. 18 (D.N.J. 2016) (quotation omitted). Further, "it is 'fundamental' to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship." *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 752 (1989) (citations omitted). Thus, a claim of tortious interference is meant to protect parties to a contact from "outside interference." *Id.* In other words, a party to a contract cannot be liable for tortiously interfering with its own contract.

Defendants argue that Quantum Income, as an affiliate of Quantum Holdings, cannot tortiously interfere with the MIPA as a matter of law. For support, Defendants point to *Gavornik v. LPL Fin. LLC*, No. CIV. 14-955, 2014 WL 3844828, at *7 (D.N.J. Aug. 5, 2014). In *Gavornik*, Judge Thompson addressed whether two defendants had tortiously interfered with the relevant contract. Judge Thompson first noted that "a party to a contract cannot be held liable both for breach of that contract and for inducing that breach." *Id.* (internal quotation marks omitted) (quoting *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 591 (Del. Ch. 1994)). Thus, to determine whether the defendants had interfered with the contract, the *Gavornik* court found that it first had to analyze whether the defendants qualified as third parties who were legally capable of interfering with the contract. *Id.*

Judge Thompson found that as a corporate affiliate,[5] the first defendant could only be held liable for tortious interference if the allegations suggested that the defendant had acted maliciously or in bad faith. *Id.* at 8 (citing *Shearin*, 652 A.2d at 591). To assess whether the defendant had

---

[5] The court in *Gavornik* noted that New Jersey courts had not analyzed the issue of whether a company can interfere with the contract of its corporate affiliates. 2014 WL 3844828, at *7. Therefore, the court determined it should look to Delaware law on this issue. *Id.* (quoting *IBS Fin. Corp. v. Seidman & Associates, L.L.C.*, 136 F.3d 940, 949–50 (3d Cir.1998) ("When faced with novel issues of corporate law, New Jersey courts often look to Delaware's rich abundance of corporate law for guidance.").

8

acted in bad faith, Judge Thompson considered the following factors: "the nature of and motive behind the conduct, the interests advanced and interfered with, societal interests that bear on the rights of each party, the proximate relationship between the conduct and the interference, and the relationship between the parties." *Id.* (quoting *Nostrame v. Santiago,* 213 N.J. 109, 122 (2013)). Finding that the plaintiffs had not alleged sufficient facts showing that the defendant had acted in bad faith, the *Gavornik* court granted the motion to dismiss as to the first defendant.

Turning to the second defendant, Judge Thompson found that as a CEO of the corporation, the defendant could not be liable for tortious interference if he was acting on behalf of his employer or principal. *Id.* (citing to *DiMaria Const., Inc. v. Interarch,* 351 N.J. Super. 558, 568 (App. Div. 2001). Further, the *Gavornik* court noted that the Third Circuit "has held that an employee falls outside the scope of his employment if the employee 'acts for personal motives, out of malice, beyond his authority, or otherwise not in good faith in the corporate interest.'" *Id.* (quoting *Yarrallo v. Hammond Inc.,* 94 F.3d 842, 849 n. 11 (3d Cir.1996)). Finding that the plaintiffs had not alleged adequate facts to meet this standard, the court in *Gavornik* granted the motion to dismiss as to the second defendant. *Id.*

Here, Plaintiffs allege that Quantum Income is more than the affiliate of Quantum Holdings. Instead, Plaintiffs assert that Quantum Income the alter ego of Quantum Holdings. Under the alter ego theory, a corporation is not just connected through ownership to a second corporation, but rather, it is legally considered to be the same entity as the second corporation. *See FDA Smart, Inc. v. Dishman Pharm. & Chemicals Ltd.,* 448 N.J. Super. 195, 203–04 (App. Div. 2016). Thus, as alleged in the FAC, Quantum Income is considered to be the same as Quantum Holdings. Quantum Holdings is a party to the contract, the MIPA, but a party cannot tortiously

interfere with its own contract. As a result, Quantum Income also cannot, as a matter of law, interfere with the contract because it is considered to be the same as Quantum Holdings.

Thus, Count III is dismissed without prejudice as to Quantum Income.[6]

### B. Count IV (Fraudulent and Negligent Misrepresentation)

Both Quantum Income and Sekhri seek a dismissal of Count IV, which asserts fraudulent and negligent misrepresentation. As stated above, the MIPA provides that any claim arising out of or as a result of the contract will be governed by New Jersey law. MIPA § 10.1.7. Thus, Plaintiffs' claims for fraudulent and negligent misrepresentation are governed by New Jersey law.

In order to establish a viable claim of fraudulent misrepresentation, "a plaintiff must prove the following: '(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'" *Banco Popular North America v. Gandi,* 184 N.J. 161, 172–73 (2005) (quoting *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610 (1997)); *Richie & Pat Bonvie Stables, Inc. v. Irving,* 350 N.J. Super. 579, 589 (App. Div. 2002). "The elements of negligent misrepresentation are essentially the same as those of common law fraud except negligent misrepresentation does not require scienter." *New York Pipeline Mech. Contractors, LLC v. Sabema Plumbing & Heating Co.,* No. CIV.A. 10-148, 2012 WL 209349, at *4 (D.N.J. Jan. 24, 2012) (citation omitted). To establish a claim of negligent misrepresentation, a plaintiff must prove that "'(1) the defendant negligently provided false information; (2) the plaintiff was a reasonably foreseeable recipient of that information; (3) the

---

[6] Because the Court is dismissing Count Three on this basis, it does not reach Defendants' additional arguments concerning the FAC's internal contradictions and the working capital withdrawals.

plaintiff justifiably relied on the information; and (4) the false statements were a proximate cause of the plaintiff's damages.'" *Id.* (quoting *McCall v. Metropolitan Life. Ins.*, 956 F. Supp. 1172, 1186 (D.N.J. 1996)).

Thus, claims of either negligent or fraudulent misrepresentation requires that the defendant made a materially false statement or misrepresentation to the plaintiff. Here, Plaintiffs have not sufficiently alleged that either Sekhri or Quantum Income made such false statements. As to Sekhri, Plaintiffs make no specific allegations that he fraudulently or negligently made false misrepresentations. First, the FAC provides that Natixis imposed additional requirements on Quantum Income and refused to increase the loan amount "because Quantum [Income], Sekhri and White expended money they raised from the Canadian public markets on working capital." FAC ¶ 13. Further to that point, the FAC alleges that "over $4 million CAD were withdrawn by Quantum [Income], White and Sekhri from the gross proceeds which were to be available to conduct the transaction." *Id.* ¶ 23. However, neither of these allegations actually allege that Sekhri made any *statements*.[7] Similarly, the FAC alleges that Sekhri was aware of both Quantum Income and Quantum Holding's financial status when Quantum Income made promises of closing the deal. *Id.* ¶ 59. This allegation, however, addresses a promise that Quantum, not Sekhri, made. The closest the FAC comes to alleging a statement as to Sekhri is the assertion that on October 29th, 2016, "Sekhri came and had no acceptable alternative options to conclude the transaction and made several *admissions* concerning White and Quantum's activities[.]" *Id.* ¶ 29. However, Plaintiffs fail to provide any sufficient facts as to what the admissions actually were, let alone allegations that the "admissions" were false. To the contrary, to the extent Sekhri made "admissions," the

---

[7] Of note, the letters attached to Plaintiffs' FAC show that it was White, not Sekhri, who withdrew the $4 million. FAC, Ex. D & E.

11

Court presumes that they were harmful to Defendants, not Plaintiffs. Therefore, the FAC does not plausibly allege that Sekhri made negligent or fraudulent statements to Plaintiffs.

Turning to Quantum Income, the Court also finds that Plaintiffs have not plausibly alleged that it made fraudulent or negligent statements. The FAC alleges that (1) "[a]s a result of Quantum [Income's] actions," Quantum Holdings did not secure the funds necessary to close the deal, *id.* ¶ 14; (2) that Quantum Income's "largest investors were asked to reinvest money[,]" *id.* ¶ 15; and (3) that Quantum, White, and Sekhri's withdrawal $4 million CAD caused the loan broker to rescind on its commits to finance Columbus's purchase price. *Id.* ¶ 25. However, these allegations concern actions, not *statements*, that Quantum Income allegedly took.

The FAC does allege that Quantum Holdings breached the MIPA when it made false promises when negotiating with Natixis. *Id.* ¶ 17. However, this allegation concerns Quantum Holdings rather than Quantum Income. And even treating them as one entity, the false statement was made to Natixis, not Plaintiffs. Finally, the FAC alleges that Quantum Income made promises that it could not fulfill, which induced Plaintiffs to enter into the MIPA. *Id.* ¶ 59. However, like with the allegations concerning Sekhri, Plaintiffs fail to provide plausible facts as to what the promises were. Thus, the FAC also does not plausibly allege that Quantum Income made negligent or fraudulent misrepresentations to Plaintiffs.[8]

Therefore, Count IV is dismissed, without prejudice as to Quantum Income and Sekhri.[9]

---

[8] In their opposition brief, Plaintiffs make references to Defendants having made omissions that give rise to the doctrine of equitable estoppel. Pl. Opp. at 12, 14. First, Plaintiffs did not plead a cause of action for equitable estoppel. Second, if Plaintiffs are basing their theory in this case on actionable omissions, they must plausibly plead what those omissions are.

[9] The FAC also apparently fails to address issues of causation as to the fraudulent and negligent misrepresentations. For example, the FAC fails to address how the timing of any alleged statements were impacted by intervening events, such as the signing of the MIPA and the

## IV. CONLCUSION

For the reasons set forth above, Defendant's Motion to Dismiss (D.E. 13) is **GRANTED**. Count III is dismissed as to Quantum Income, and Count IV is dismissed as to both Quantum Income and Sekhri. The dismissal, however, is without prejudice to allow Plaintiffs an opportunity to file a Second Amended Complaint. Plaintiffs have thirty (30) days to file a Second Amended Complaint, if they so choose, consistent with this Opinion. If Plaintiffs fail to file a Second Amended Complaint, the dismissal will be with prejudice. An appropriate Order accompanies this opinion.

Dated: May 31, 2018

_____
John Michael Vazquez, U.S.D.J.

---

withdrawal of the $4 million from the escrow account. If Plaintiffs choose to amend their complaint, they should also plausibly allege facts to support causation.